PD-1479-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/16/2015 3:48:24 PM
Accepted 12/18/2015 12:51:39 PM
ABEL ACOSTA
CLERK

## NO. PD-1479-15

### IN THE
### COURT OF CRIMINAL APPEALS
### OF TEXAS

---

### NO. 01-12-00970-CR
### IN THE COURT OF APPEALS
### FOR THE
### FIRST JUDICIAL DISTRICT OF TEXAS
### HOUSTON, TEXAS

---

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **APPELLEE** |
| | § | |
| **V.** | § | |
| | § | |
| | § | |
| **HECTOR L. RODRIGUEZ** | § | **APPELLANT** |

---

### APPEAL FROM COUNTY COURT AT LAW NO. 5
### HARRIS COUNTY, TEXAS
### TRIAL COURT NO. 1726063

---

### APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

---

**W. Troy McKinney**
**Schneider & McKinney, P.C.**
**Texas Bar No. 13725020**
**440 Louisiana, Suite 800**
**Houston, Texas 77002**
**(713) 951-9994**
**(713) 224-6008 (FAX)**
**E-mail: wtmhousto2@aol.com**

**J. Gary Trichter**
**Trichter & Murphy, P.C.**
**Texas Bar No. 20216500**
**420 Heights Blvd.**
**Houston, Texas 77007**
**(713) 524-1010**
**(713) 524-1080 (FAX)**
**E-mail: gary@texasdwilaw.com**

**ATTORNEYS FOR APPELLANT**

**APPELLANT REQUESTS ORAL ARGUMENT**

## Identity of Parties and Counsel

The following is a complete list of all parties to the trial court's judgment, and the names and addresses of all trial and appellate counsel:

| | | |
|---|---|---|
| Hector L. Rodriguez | - | Appellant. |
| State of Texas | - | Appellee. |
| W. Troy McKinney<br>Schneider & McKinney, P.C.<br>440 Louisiana, Suite 800<br>Houston, Texas 77002 | - | Appellant's retained counsel at trial and on appeal. |
| J. Gary Trichter<br>Trichter & Murphy, P.C.<br>420 Heights Blvd.<br>Houston, Texas 77007 | - | Appellant's retained counsel at trial and on appeal. |
| George Stuart Tallichet<br>Lewis Ashton Thomas<br>1201 Franklin<br>Houston, Texas 77002 | - | Assistant District Attorneys at trial. |
| Melissa P. Hervey<br>Stuart Tallichet<br>1201 Franklin<br>Houston, Texas 77002 | - | Assistant District Attorneys on appeal. |
| Hon. Margaret Harris | - | Trial Judge. |

# Table of Contents

Identities of Parties and Counsels. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

List of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Grounds for Review – Questions Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Arguments for Granting Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Grounds One Through Six. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Is there a Fourth Amendment expectation of privacy and standing to challenge either the acquisition of hospital blood test results or medical records generally and did the court of appeals err in failing to address the general medical records issue?  Should **Hardy** be overruled?

Grounds Seven Through Ten. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Even if there is not Fourth Amendment standing or an expectation of privacy, does **Hardy** preclude exclusion sought under Article 38.23 for a violation of  state or federal law and, **Hardy** not withstanding, does a violation of state or federal law require suppression under Article 38.23, without regard to whether there is Fourth Amendment standing or an expectation of privacy.  Is the court of appeals decision contrary to  **Wilson v. State** and are the statutes relating to grand jury

subpoenas, the MPA, or the HIPAA regulations a basis for suppression under Article 38.23, as a violation of a state or federal law related to the acquisition of evidence?

Conclusion and Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Appendix A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Appendix B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Appendix C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Appendix D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

List of Authorities

Cases

Dickerson v. State,
965 S.W.2d 30
(Tex. App.--Houston [1st Dist.] 1998,
pet. dism'd, improvidently granted). . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Dickerson v. State,
986 S.W.2d 618
(Tex. Crim. App. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Ferguson v. City of Charleston,
532 U.S. 67 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15

Hailey v. State,
50 S.W.3d 636
(Tex. App.—Waco 2001),
rev'd on other grounds,
87 S.W.3d 118
(Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hardy v. State,
963 S.W.2d 516
(Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Kennemur v. State,
280 S.W.3d 305,
(Tex. App.—Amarillo 2008, pet. ref'd),
cert. denied , 556 U.S. 1191,
129 S. Ct. 2005,
173 L. Ed. 2d 1101 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Kirsch v. State,
276 S.W.3d 579
(Tex. App.--Houston [1st Dist]. 2008),
aff'd on other grounds,
306 S.W.3d 738
(Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

Maldonado v. State,
No. 05-09-00383-CR,
2011 Tex. App. LEXIS 1984,
2011 WL 924352
(Tex. App.--Dallas, Mar. 18, 2011, no pet.). . . . . . . . . . . . . . . . . . . . 10

Murray v. State,
245 S.W.3d 37
(Tex. App.--Austin 2007, pet. ref'd). . . . . . . . . . . . . . . . . . . . . 7, 8, 16, 22

Owens v. State,
No. 01-12-00075-CR,
2013 Tex. App. LEXIS 13767
2013 WL 5947336
(Tex. App–Houston [1st Dist.],
Nov. 7, 2013, no pet). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Spebar v. State,
121 S.W.3d 61
(Tex. App.–San Antonio 2003, no pet). . . . . . . . . . . . . . . . . . . . . . . . . 20

State v. Comeaux,
818 S.W.2d 46
(Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

State v. Jewell,
    No. 10-11-00166-CR,
    2013 Tex. App. LEXIS 930,
    2013 WL 387800
    (Tex. App.--Waco, Jan. 31, 2013, no pet.) . . . . . . . . . . . . . . . . . . . . . . . 8, 16

State v. Kelly,
    204 S.W.3d 808
    (Tex. Crim. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Village of Ridgefield Park v. New York Susquehanna
& Western Railway Corp.,
    163 N.J. 446,
    750 A.2d 1104, 1111 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Wilson v. State,
    311 S.W.3d 452
    (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**Statutes**

42 U.S.C. § 1320d-6(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

45 C.F.R. §

160.103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
160.203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
164.512(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
164.512(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
164.512(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
164.512(f)(1)(ii)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Tex. R. App. P.

66.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
66.3(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
66.3(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
66.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tex. Code Crim. Pro Art. 38.23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

TEX. OCC. CODE

§ 159.001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 159.002(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 159.003(a)(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 159.003(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§159.003(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Tex Rev.Civ. Stat, Art. 4495b §5.08 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Other**

Emergency Medical Services Act,
      Texas Health and Safety Code Chapter 773. . . . . . . . . . . . . . . . . . . . . . . 7, 18

Note, Developments in the Law:
      The Law of Media,
      120 HARV. L. REV. 990 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**To the Honorable Judges of the Court of Criminal Appeals**:

Hector L. Rodriguez, Appellant, through his attorneys, W. Troy McKinney and J. Gary Trichter, submits this petition for discretionary review.

### Statement Regarding Oral Argument

Appellant requests oral arguments in this case on the basis that both the legal and factual issues involve not only important issues of state and federal law, but also because this case presents a compilation of complex issues arising from and following this Court's decision in **Hardy v. State** and subsequent state and federal laws impacting its scope and continued viability. As evidenced by over 100 appellate decisions on issues arising from Hardy, the bench and bar of this State need guidance from this Court concerning the scope and applicability of Hardy. Oral arguments would aid this Court in evaluating and deciding the important issues in this case.

### Statement of the Case

On September 25, 2010, Appellant was charged by information with driving while intoxicated. CR3. Appellant filed a Motion to Suppress evidence and a hearing was held on August 10, 2012. 2RR. On August 20, 2012, the court denied Appellant's motion to suppress. CR171. On September 17, 2012, pursuant to a plea bargain, the court assessed punishment at 180 days confinement, probated for one year, and a $750 fine. CR199. The trial court specifically gave Appellant permission to appeal.

1

CR208.  A motion for new trial was timely filed on October 12, 2012. CR238. It was overruled by operation of law. On October 4, 2012, timely written notice of appeal was filed. CR212.

## Statement of Procedural History

Appellant moved to suppress the introduction of his medical records and blood alcohol test results.  The trial court conducted an evidentiary hearing consisting of live testimony, two witness affidavits, multiple physical exhibits, and several stipulations.  The factual evidence was undisputed.  The trial court entered extensive findings of fact and conclusions of law and denied the motion to suppress.  3RR-25. Supp CR.[1]  Following denial of his motion to suppress, Appellant pled guilty and appealed the denial of his motion to suppress.

The Court of Appeals delivered its published opinion on June 25, 2015.  A copy of the opinion is attached as Appendix A.  A motion for rehearing was filed on August 10, 2015, and overruled on October 15, 2015.  This petition is due not later than December 17, 2015.

---

[1]    A copy of the findings is contained in Appendix C.

**Grounds for Review – Questions Presented**

1.      Is there a Fourth Amendment expectation of privacy in blood test results when the blood is drawn and analyzed by a hospital for medical purposes?

2.      Does a defendant in a criminal case have Fourth Amendment standing to challenge the legality of the method of the acquisition of his blood test results when the blood is drawn and analyzed by a hospital for medical purposes?

3.      Is **Hardy v. State** still valid law in light of intervening legal events and should it be overruled?

4.      Is there a Fourth Amendment expectation of privacy in medical records generally (other than blood test results)?

5.      Does a defendant in a criminal case have Fourth Amendment standing to challenge the legality of the method of the acquisition of his medical records generally (other than blood test results)?

6.      Did the Court of Appeals err in only addressing the Fourth Amendment standing issue with respect to the blood test results and in failing to address the expectation of privacy and standing issues with respect to medical records generally?

7.      Does a defendant have standing to challenge the legality of the method of the acquisition, and thus the admissibility, of his blood test results and medical records under Tex. Code Crim. Pro Art. 38.23, when the blood is drawn and analyzed

for medical purposes and when his medical records relate to his treatment, without regard to whether there is Fourth Amendment standing?

8.    Did the Court of Appeals err in holding that **Hardy v. State** governed and controlled the determination of the Article 38.23 suppression issue when the Court in **Hardy** expressly limited its holding to the Fourth Amendment issue presented to it?

9.    Is the Court of Appeals decision contrary to this Court's decision in **Wilson v. State**, 311 S.W.3d 452 (Tex. Crim. App. 2010), which held (1) that whether evidence is obtained in violation of the United States Constitution is an entirely different inquiry – and does not control – whether evidence is subject to suppression under Article 38.23; and (2) that suppression under 38.23 is warranted when there is a violation of a penal or other law related to the acquisition of evidence when that violation is the method used to acquire the evidence and the evidence is acquired as a result of a violation of applicable state law?

10.    Is a violation of the statutes relating to grand jury subpoenas, the Medical Practices Act, or  the regulations under HIPAA a  basis for suppression under Article 38.23, as a violation of a state or federal law penal law, a privacy law, or a law related to the acquisition of evidence?

4

## Statement of Facts

The facts in this case are simple and undisputed.  Appellant was arrested and taken to the police station.  He fell while being escorted into the jail and was taken to the hospital where blood was drawn and analyzed for medical purposes.

A civilian Houston Police Department (HPD) employee requested a grand jury subpoena from the District Attorney's Office (HCDAO) for Appellant's medical records and blood test results. Consistent with its practice and policy, a paralegal with the HCDAO, affixed a stamped signature of a HCDAO lawyer to a document labeled grand jury subpoena without consulting or obtaining approval from any attorney in the HCDAO.

The purported grand jury subpoena was served on the hospital.  The hospital provided the records to the paralegal, who forwarded them to the HPD civilian employee, where they were retained.  The purported grand jury subpoena issued from a grand jury whose term had expired at the time the records were produced.  The records were never delivered to either any grand jury or the District Clerk.[2]

## Arguments for Granting Review

In **State v. Comeaux**, 818 S.W.2d 46 (Tex. Crim. App. 1991), an officer,

---

[2]    A detailed statement of facts, referencing the trial court's findings of fact, is attached as Appendix B.

following a traffic accident, requested a hospital nurse who had drawn blood from Comeaux on the request of a physician solely for medical purposes to give him a portion of the blood draw. When the nurse declined, the officer ordered her to give him a portion of the sample and gave her a mandatory blood draw form. The officer seized the sample and had it tested by a state lab. The trial court suppressed the blood test results and the court of appeals affirmed. A four-judge plurality of this Court determined that Comeaux had a reasonable expectation of privacy for Fourth Amendment purposes based on the then existing provisions of the Texas Medical Practices Act (MPA).[3] The concurring judge, who formed the majority for affirming suppression, would have decided the case solely on the basis of a violation of the MPA and would have suppressed the results under Article 38.23.[4]

Six years later, this Court addressed a similar issue in **Hardy v. State**, 963 S.W.2d 516 (Tex. Crim. App. 1997) where the state obtained records of hospital blood test results with a grand jury subpoena. The blood had been drawn and analyzed and a report prepared solely for medical purposes. Hardy claimed that his

---

[3] The Court noted in its opinion that the portions of the MPA at issue had been repealed at the time of its decision in **Comeaux**, but had been in effect at the time of the seizure of Comeaux's blood. The terms of the MPA that existed at that time were similar to, but not the same as, those that exist today. The MPA today appears to be broader that it was at the time of **Comeaux**.

[4] The plurality declined to review the Article 38.23 claim because it was not an issue on which the State had sought discretionary review. **Comeaux** at n.6.

6

blood test results had been unlawfully obtained in violation both of Texas statutory provisions[5] and in violation of the Fourth Amendment. With respect to the Fourth Amendment issue, the Court framed the question to be answered as, "whether the government's acquisition of the written report infringed upon a societally-recognized expectation of privacy." **Id.**, at 524.

This Court, in a 5-4 decision, held:

We express no opinion concerning whether society recognizes a reasonable expectation of privacy in medical records in general, or whether there are particular situations in which such an expectation might exist. We note only that, given the authorities discussed, whatever interests society may have in safeguarding the privacy of medical records, they are not sufficiently strong to require protection of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident.

**Id.**, at 527.

**Hardy** answered only the very narrow Fourth Amendment expectation of privacy question in blood test reports when blood is drawn for medical purposes following a traffic accident. **Murray v. State**, 245 S.W.3d 37, 41 (Tex. App.--Austin 2007, pet. ref'd); **Kirsch v. State**, 276 S.W.3d 579 (Tex. App.--Houston [1st Dist].

---

[5]    In the trial court, Hardy alleged a violation of the MPA, Tex Rev.Civ. Stat, Art. 4495b §5.08 (repealed as to criminal law matters 12-18-85), and on discretionary review alleged a violation of the Emergency Medical Services Act, Texas Health and Safety Code Chapter 773. The Court held that the relevant portions of the MPA had been repealed when the Court adopted the Texas Rules of Evidence and did not apply and that there was no violation of the Emergency Services Practices Act. The Court never suggested that Hardy lacked standing to raise the claim based on state statutes.

2008), **aff'd on other grounds**, 306 S.W.3d 738 (Tex. Crim. App. 2010). Unlike **Comeaux**, it did so without considering the provisions of the MPA that had been relied on in **Comeaux**. It did not address, much less answer, any other legal question, including (1) whether Article 38.23 requires exclusion of evidence obtained in violation of state or federal statutes, (2) whether there was an expectation of privacy in medical records generally. **Murray**, 245 S.W.3d at 41-42 (recognizing that **Hardy** did not decide any issue with respect to medical records generally); **see also State v. Jewell**, No. 10-11-00166-CR, 2013 Tex. App. LEXIS 930, 2013 WL 387800 (Tex. App.--Waco, Jan. 31, 2013, no pet.) (finding an expectation of privacy in medical records generally), or (3) whether a person could challenge the use of a grand jury subpoena to obtain blood test result records on any legal basis, such as Article 38.23, other than when raised as a Fourth Amendment claim.

Though much has changed since **Hardy** was decided and though there have been over 100 court of appeals decisions deciding issues related to **Hardy**, this Court has not yet weighed in on any of the issues.

Since **Hardy** was decided, the Health Insurance Portability and Accountability Act (HIPAA) became effective. Federal regulations promulgated pursuant to HIPAA regarding privacy and confidentiality of health information became effective on April 14, 2003. To the extent any state law is less stringent than HIPAA, it is preempted.

8

45 C.F.R. § 160.203. While HIPAA expressly preempts any contrary state law, which includes state judicial decisions, states are free to adopt more stringent standards than those promulgated pursuant to HIPAA.[6] **See Village of Ridgefield Park v. New York Susquehanna & Western Railway Corp.**, 163 N.J. 446, 455, 750 A.2d 1104, 1111 (1999).

Under the HIPAA regulations, a "covered health care provider," rendering medical services in a "covered transaction" is prohibited from disclosing "protected health information" without the patient's consent, unless it is authorized by 45 C.F.R. § 164.512(f). "Health information" includes any information relating to the past, present, or future mental or physical condition of an individual, including a person's identity. 45 C.F.R. § 160.103.

While HIPAA generally provides for privacy and confidentiality of protected health care information, it does allow for disclosure if the "use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law." 45 C.F.R. §164.512(a); **see also** Note, Developments in the Law: The Law of Media, 120 HARV. L. REV. 990, 1060 (2007). A "covered entity

---

[6] The MPA, infra, appears facially more stringent that HIPAA with respect to the privacy of medical information and records: that is, the MPA provides privacy protections greater than those provided by HIPAA both in the first instances – as to confidentiality and as a privilege -- and in the substantially narrower scope of exceptions, especially with respect to disclosure in relationship to criminal proceedings and prosecutions.

may disclose protected health information for a law enforcement purpose to a law enforcement official" when, as applicable to the instant case, it is " [i]n compliance with and as limited by the relevant requirements of . . . a grand jury subpoena." 45 C.F.R. § 164.512(f)(1)(ii)(B). **Maldonado v. State**, No. 05-09-00383-CR, n. 2, 2011 Tex. App. LEXIS 1984, 2011 WL 924352 (Tex. App.--Dallas, Mar. 18, 2011, no pet.) (recognizing that HIPAA requires that a disclosure of protected health information may only be made "without the individual's consent to the extent the disclosure is required by law and the disclosure is limited to the relevant requirements of the applicable law" and that "the disclosure must meet the requirements of 164.512 (c), (e), or (f). 45 C.F.R. 164.512(a)(2).");[7] **see also Kennemur v. State**, 280 S.W.3d 305, 311 n.5 (Tex. App.—Amarillo 2008, pet. ref'd), cert. denied , 556 U.S. 1191, 129 S. Ct. 2005, 173 L. Ed. 2d 1101 (2009)(same).

42 U.S.C. § 1320d-6(a) makes it a federal crime, and in some instances a felony, for a person to knowingly obtain or disclose "individually identifiable health information relating to an individual [or another person]."

HIPAA is widely and uniformly recognized as establishing a nationwide minimum level of privacy and confidentiality in health care information.

---

[7] The court in **Maldonado** never reached the merits of the 38.23 issue because trial counsel stated "no objection" when the records were offered at trial, thus waiving the pretrial ruling denying his motion to suppress.

Since **Hardy** was decided, the portions of the Medical Practices Act (MPA) that this Court repealed in 1985 when it adopted the Texas Rules of Evidence, **Hardy**, at 519-523, have been reenacted by the Texas Legislature and, since 1999, have been codified in the Texas Occupations Code. TEX. OCC. CODE § 159.001, et seq.

TEX. OCC. CODE § 159.002 (b) provides that a "record of the identify, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician is confidential and privileged and may not be disclosed except as provided by this chapter." Section 159.003 (a)(10) provides an exception to the privilege of confidentiality "in a criminal prosecution in which the patient is a victim, witness, or defendant." Despite the general exception to confidentiality in criminal prosecutions in (a)(10), § 159.003 (b) expressly provides that § 159 does "not authorize the release of confidential information to investigate or substantiate criminal charges against a patient," and § 159.003 (c) expressly provides that "[r]ecords or communications are not discoverable under Subsection (a)(10) until the court in which the prosecution is pending makes an in camera determination as to the relevancy of the records or communications or any portion of the records or communications. That determination does not constitute a determination as to the admissibility of the information."

The MPA recognizes that notwithstanding and despite the lack of a privilege

11

in the Rules of Evidence (and notwithstanding and despite this Court's prior repeal of a prior version of the statute) regarding the ultimate admissibility of confidential medical information, there nonetheless exists a privilege and confidentiality in those records with respect to discovery of them "to investigate or substantiate criminal charges against a patient" and a limited privilege requiring a prior in camera inspection in all other instances involving a criminal prosecution.

Since **Hardy** was decided, the Supreme Court decided **Ferguson v. City of Charleston**, 532 U.S. 67 (2001), in which the Court was asked to decide the constitutionality of a program where there was a joint effort by law enforcement, prosecutors, and a state hospital to turn over to law enforcement and prosecutors urine drug test results conducted on pregnant women and those giving birth when test results showed the presence of illegal drugs or those potentially harmful to the fetus or newborn child.

Relying on the amicus briefs of the American Medical Association and the American Public Health Association, and in the context of unauthorized disclosure of information to third parties, the Court held that "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." 532 U.S. at 79. The Court predicated its foregoing statement with its

observation that unauthorized disclosure of medical test information to third parties was a greater privacy intrusion than when the results were used solely for other purposes. The Court wrote.

> In the previous four [special needs] cases, there was no misunderstanding about the purpose of the test or the potential use of the test results, and there were protections against the dissemination of the results to third parties. The use of an adverse test result to disqualify one from eligibility for a particular benefit, such as a promotion or an opportunity to participate in an extracurricular activity, involves a less serious intrusion on privacy than the unauthorized dissemination of such results to third parties.

**Id.**, at 79.

It would have been impossible to make a comparison of the degrees of intrusion of the expectation of privacy if there was not a general expectation of privacy in medical test results and records. If there had been no general expectation of privacy in all medical records, it would have been unnecessary to even consider whether a disclosure might have been "unauthorized."

Importantly, the Court specifically rejected the idea that the purpose of the program (the investigation and detection of crime) was sufficient to make the search reasonable and it did not come even close to holding that the purpose of the program (like the purpose of grand jury subpoenas) would mean that there was no expectation of privacy. If the basis for the intrusion – as occurs when one says that those who

have had blood taken at a hospital for medical purposes have no expectation of privacy in the results because they might show evidence of a crime – was sufficient to eliminate the expectation of privacy, nothing beyond such a conclusion would have been necessary in **Ferguson** because the results of the urine drug tests in **Ferguson** may be evidence of a crime just as hospital blood-alcohol test results may be evidence of DWI.

Since **Hardy** was decided, over 100 court of appeals decisions have been issued with respect to these and a number of other **Hardy** related issues. Despite the self-limiting holding in **Hardy**, every court of appeals decision, including the decision in this case, has expanded **Hardy**'s scope beyond its stated holding.

These issues continued to be litigated and appealed in a significant number of cases because of the lack of guidance from this Court. The bench and bar of this State need guidance from this Court, which will only occur by this Court granting discretionary review.

### Grounds One Through Six

Is there a Fourth Amendment expectation of privacy and standing to challenge either the acquisition of hospital blood test results or medical records generally and did the court of appeals err in failing to address the general medical records issue? Should **Hardy** be overruled?

Though **Hardy** resolved the important issue of federal law relating to standing

and an expectation of privacy as of 1997, this Court has not spoken on this issue in the intervening 19 years during which much of the legal landscape has changed with respect to the basis for this Court's holding in **Hardy**.

Whether **Hardy's** expectation of privacy and standing holdings remains viable in light of intervening legal events is, pursuant to TEX. R. APP. P. 66.3(b), as it was in 1997, an important issue question of state and federal law that has not been, but should be, settled by this Court.

Whether there is an expectation of privacy in medical records generally, and whether the Court of Appeals in this case improperly expanded **Hardy's** expectation of privacy and standing holdings to include all medical records is, pursuant to TEX. R. APP. P. 66.3(b), as it was in 1997, an important question of state and federal law that has not been, but should be, settled by this Court.

Whether the court of appeals decision is contrary to the Supreme Court's decision in **Ferguson** on an important question of federal constitutional law, review is proper pursuant to TEX. R. APP. P. 66.3(c).

Whether the Court of Appeals erred in only addressing the blood test issue and in failing to address general medical records issue, despite the issue being raised in the trial court, in Appellant's brief, in the trial court's findings, and in Appellant's motion for rehearing, warrants review pursuant to TEX. R. APP. P. 66.3(f), because

15

the court of appeals has so far departed from the accepted and usual course of judicial proceedings as to call for an exercise of this Court's power of supervision.

Importantly, while neither **Hardy** nor the Court of Appeals in this case decided whether there was an expectation of privacy in medical records generally, other courts of appeals have done so. **See Murray v. State**, 245 S.W.3d 37, 41-42 (Tex. App.--Austin 2007, pet. ref'd) (**Hardy** did not decide any issue with respect to medical records generally); **State v. Jewell**, No. 10-11-00166-CR (Tex. App.--Waco, Jan. 31, 2013, no pet.) (finding an expectation of privacy in medical records generally).

If the Court of Appeals opinion can be read to apply to medical records generally, review is warranted pursuant to Tex. R. App. P. 66.3(a), because it conflicts with the decisions of the Austin and Waco Court of Appeals' decisions in **Murray** and **Jewell**.

#### Grounds Seven Through Ten

Even if there is not Fourth Amendment standing or an expectation of privacy, does **Hardy** preclude exclusion sought under Article 38.23 for a violation of state or federal law and, **Hardy** not withstanding, does a violation of state or federal law require suppression under Article 38.23, without regard to whether there is Fourth Amendment standing or an expectation of privacy. Is the court of appeals decision contrary to **Wilson v. State** and are the statutes relating to grand jury subpoenas, the MPA, or the HIPAA regulations a basis for suppression under Article 38.23, as a violation of a state or federal law related to the

acquisition of evidence?

**Hardy** was a narrow, limited holding. By its terms it decided only whether there was an expectation of privacy in the results of a blood test conducted for medical purposes: that is, only whether there was standing to raise a Fourth Amendment claim.

Though **Hardy** never addressed, much less decided, whether exclusion of the results of a blood test conducted for medical purposes was independently suppressible under Article 38.23 if the results were obtained in violation of state or federal law, the court of appeals in this case, and every other court of appeals that has decided the issue, relied solely on **Hardy** for concluding that the absence of an expectation of privacy and the lack of Fourth Amendment standing also precluded suppression under Article 38.23.

The first case decided after **Hardy** was **Dickerson v. State**, 965 S.W.2d 30 (Tex. App.--Houston [1st Dist.] 1998, pet. dism'd, improvidently granted).[8] After rejecting the identical constitutional claim raised in **Hardy**, the court also rejected claims of defects in the grand jury subpoena process. It held, "[i]n the absence of

---

[8] **Dickerson v. State**, 986 S.W.2d 618 (Tex. Crim. App. 1999) (Johnson, J, dissenting to the dismissal of the petition for discretionary review) ("While the records [obtained with a "so called" grand jury subpoena] might have ultimately been discoverable, Deputy Swango chose to take an improper shortcut; his actions were both improper and premature. For the reasons stated in Judge Price's dissent to Hardy . . . . (Price, J., dissenting), I dissent to the improvident grant.")

17

any constitutional or statutory reasonable expectation of privacy, appellant has no standing to complain of defects in the grand jury subpoena process. **See Comeaux v. State**, 818 S.W.2d 46, 51 (Tex. Crim. App. 1991)."

The court's reliance on **Comeaux** for such a broad proposition was misplaced. **Comeaux** did not involve a grand jury subpoena or blood test results. It involved an unlawful command by a police officer to a nurse to turn over the actual blood drawn. In **Comeaux**, the Court had no occasion to decide whether the statutes regulating grand jury subpoenas created an expectation of privacy or constituted violation of a law for purposes of exclusion under Article 38.23. **Comeaux** did recite, as did **Hardy**, the well established proposition that there had to be an expectation of privacy for a Fourth Amendment claim, which was the basis on which the court affirmed exclusion of the evidence as unlawfully obtained, but that is as far as it went.

The major difference between **Hardy** and **Comeaux** is that in **Comeaux** the MPA was still in effect and by the time of **Hardy**, the MPA had been repealed. Thus, in **Comeaux**, the Court went no further than the MPA in finding a statutorily based expectation of privacy and in **Hardy**, the court had to look more broadly because the MPA no longer applied. Even though the court in **Hardy** looked more broadly, it only considered the Emergency Services Practices Act. The court in

18

**Hard**y did not consider whether a violation of any other statute would provide a basis to exclude medical record evidence under Article 38.23 and certainly never decided whether a violation of statutes regulating grand jury subpoenas would be a basis for exclusion under Article 38.23. Had **Dickerson** limited its holding to "no standing to complain of defects in the grand jury subpoena process for Fourth Amendment purposes," it may have been correct – at least at the time and pursuant to **Hardy**.[9] But, it did not do so, and the effect of the overly broad statement in **Dickerson** has been that every other court of appeals to have decided the issue since that time has also blindly followed **Dickerson** or its progeny.[10]

The initial misstating or over broadening of the holdings in **Comeaux** and **Hardy** has led to blind adoption of that standard even though neither case made any such pronouncement other than as applicable to a Fourth Amendment claim.

Texas appellate courts have, however, held that if the blood was drawn at the hospital without consent, it would constitute an assault and suppression of the blood test results under 38.23 would be proper.[11] Not one of these cases suggested that

---

[9]     **Dickerson** does not suggest that a claim for exclusion under 38.23 based on statutory violations was raised. Either no 38.23 claim was raised or the court did not analyze it separately.

[10]     A complete list of these cases is contained in Appendix D.

[11]     **Hailey v. State**, 50 S.W.3d 636, 640 (Tex. App.—Waco 2001), **rev'd on other grounds**, 87 S.W.3d 118 (Tex. Crim. App. 2002) (blood drawn by hospital without consent was

19

there was no standing to seek suppression under Article 38.23 based on the evidence being obtained by a criminal assault (even though the results were later obtained with a grand jury subpoena) just because there was no standing to raise a Fourth Amendment claim. The merits of these claims were addressed precisely because whether there was a valid Fourth Amendment claim was legally irrelevant to whether suppression was required under Article 38.23.

Article 38.23 protects more interests than just those included in the constitutional expectation of privacy analysis. Though "[t]he underlying purpose of both the federal exclusionary rule and article 38.23 is the same: to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement," **Wilson v. State**, 311 S.W.3d 452, 458-59 (Tex. Crim. App. 2010) , the scope and remedies under Article 38.23 are much different than Fourth Amendment standing. A Fourth Amendment violation requires suppression of evidence only if the federal exclusionary rule requires it. However, even if the federal exclusionary rule does not

an assault and illegally obtained for purposes of 38.23; reversed on basis that there was no lack of consent). **Compare State v. Kelly**, 204 S.W.3d 808, 820-21 (Tex. Crim. App. 2006) (hospital staff did not assault defendant and thus defendant's blood test results were admissible); **Owens v. State**, No. 01-12-00075-CR, 2013 Tex. App. LEXIS 13767; 2013 WL 5947336 (Tex. App–Houston [1ˢᵗ Dist.], Nov. 7, 2013, no pet)(published)(no lack of consent and blood draw justified to provide emergency care); **Spebar v. State**, 121 S.W.3d 61, 64 (Tex. App.—San Antonio 2003, no pet.) (distinguishes **Hailey** because of factual deficiencies in the record and factual differences that would not show an abuse of discretion by trial judge in implicitly finding no assault); **Ramos v. State**, 124 S.W.3d at 336 (evidence supported trial court's implied finding of consent for medical treatment).

require suppression, such as for inevitable discovery, the same Fourth Amendment violation would require suppression under Article 38.23.

In **Wilson**, this Court held that Article 38.23 may be "invoked for statutory violations [...]related to the purpose of the exclusionary rule or to the prevention of the illegal procurement of evidence of crime." **Id.**, at 459. "The primary purpose of article 38.23(a) is to deter unlawful actions which violate the rights of criminal suspects in the acquisition of evidence for prosecution." **Id.** It is not just privacy rights or the expectation of privacy that are within the scope of Article 38.23. "[T]he type of law violation that the Texas Legislature intended to prohibit when it enacted article 38.23 [is] conduct by overzealous police officers who, despite their laudable motives, break the penal laws directly related to gathering and using evidence in their investigations." **Id**, at 461. Whether evidence is obtained in violation of the Constitution is an entirely different inquiry – and does not control – whether evidence is subject to suppression under Article 38.23. **Id.**, 463-464.

HIPAA, the MPA and the grand jury statutes regulate the methods by which evidence may be obtained and may have penal consequences. Under **Wilson**, they are within the scope of laws for which a violation requires exclusion under 38.23. Even though argued in Appellant's brief and raised in the motion for rehearing, the court of appeals declined to even acknowledge, much less follow, this Court's

21

decision in **Wilson**. The court of appeals erred in holding that Appellant could not seek suppression under 38.23 based on violations of these statutes in the acquisition of the evidence of his blood test results and his medical records in general.

Because the court of appeals decision in this case conflicts with the important question of state law decided by this Court in **Wilson** and **Comeaux**, review is proper pursuant to TEX. R. APP. P. 66.3(c).

Because the court of appeals has decided that this Court's decision in **Hardy** applied to standing to seek 38.23 suppression, review is proper pursuant to TEX. R. APP. P. 66.3(b) because the court of appeals has decided an important question of state law that has not been, but should be settled by this Court.

Because the court of appeals decision in this case, that **Hardy** decided the 38.23 issue, conflicts with the Austin and Houston (First) court of appeals decisions in **Murray** and **Kirsch**, review is proper pursuant to Tex. R. App. P. 66.3(a).

.

## Conclusion and Prayer

Appellant prays that this Court grant discretionary review to decide the important issues in this case and either vacate the court of appeals opinion and remand this case for consideration of the issues not addressed by the Court of Appeals, or, alternatively, decide all of the issues presented and reverse the judgment of the Court of Appeals and remand this case to the trial court for a new trial.

Respectfully submitted,

*/s/ W. Troy McKinney*
W. Troy McKinney
Schneider & McKinney, P.C.
Texas Bar NO. 13725020
440 Louisiana, Suite 800
Houston, Texas 77002
(713) 951-9994
(713) 224-6008 (FAX)
 Email: wtmhousto2@aol.com


 */s/ J. Gary Trichter*
J. Gary Trichter
Trichter & Murphy, P.C.
Texas Bar No. 20216500
420 Heights Blvd.
Houston, Texas 77002
(713) 524-1010
(713) 524-1080 (FAX)
E-mail: gary@texasdwilaw.com

Attorneys for Appellant

Certificate of Service

This is to certify that a true and correct copy of the attached and foregoing document has been served on the Harris County District Attorney's Office at 1201 Franklin, Houston, Texas 77002, and on the State Prosecuting Attorney at P.O. Box 3046, Austin, Texas   78711, by electronic service on this 16th day of December, 2015.

*/s/ W. Troy McKinney*
W. Troy McKinney

Certificate of Compliance

I certify that this document was prepared with Word Perfect X3, and that, according to that program's word-count function, the sections covered by TEX. R. APP. P. 9.4(i)(1) contain 4499 words.

*/s/ W. Troy McKinney*
W. Troy McKinney

**Appendix A**

**Opinion**

Opinion issued June 25, 2015



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00970-CR

————————————

**HECTOR L. RODRIGUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 5**
**Harris County, Texas**
**Trial Court Case No. 1726063**

---

## OPINION

The State charged Hector L. Rodriguez by information with Class B misdemeanor driving while intoxicated. *See* TEX. PENAL CODE ANN. § 49.04 (West Supp. 2014). Before trial, Rodriguez moved to suppress evidence of his blood-test results. After a hearing, the trial court denied the requested relief.

Pursuant to a plea bargain with the State, Rodriguez pleaded guilty to the charge. The trial court accepted the plea and agreed to follow the State's punishment recommendation, sentencing Rodriguez to 180 days' confinement and suspending that sentence conditioned on successful completion of one year of community supervision.

The trial court certified Rodriguez's right to appeal its ruling on his motion to suppress. On appeal, Rodriguez contends that the trial court erred in denying the motion because the State obtained his medical records and blood-test results in violation of state and federal law and his rights under the Fourth Amendment of the United States Constitution. We affirm.

## Background

The parties do not dispute the facts material to Rodriguez's motion to suppress. Close to 2:00 A.M. in late September 2010, Officer J. Roberts and Officer Pitts of the Houston Police Department were in the course of arresting two individuals for driving while intoxicated (DWI) in downtown Houston when they observed Rodriguez driving toward them, heading the wrong direction down a one-way street. The officers instructed Rodriguez to pull over, and Rodriguez came to a stop near Officer Pitts's patrol car.

After Officer Roberts secured the other two DWI suspects in the back of his patrol car, he approached Rodriguez's car. He noticed that Rodriguez had red,

2

glassy eyes and slurred speech, and smelled strongly of alcohol, as did the interior of his car. Rodriguez admitted that he had begun drinking beer at 3:00 P.M. the previous afternoon and that he had just left a nightclub.

Officer Roberts administered the horizontal gaze nystagmus (HGN) test on Rodriguez and observed all six of the possible clues for intoxication. Rodriguez refused to participate in any other field sobriety tests and was placed under arrest for suspicion of DWI. According to protocol, Officer Roberts handcuffed Rodriguez's hands together at the back and placed him in the backseat of Officer Pitts's patrol car.

When they arrived at the police station, Officer Pitts attempted to escort Rodriguez from the patrol car into the station by holding onto Rodriguez's arm. Rodriguez told Officer Pitts, "Don't touch me. I can do this" and pulled away from Officer Pitts's grasp. Rodriguez then lost his balance and fell face forward onto the concrete. He remained on the ground, bleeding heavily from his face, head, and nose. Officer Pitts immediately called for an ambulance. Paramedics with the Houston Fire Department arrived and transported Rodriguez to a nearby hospital.

Officer Roberts followed the ambulance to the hospital emergency room, where he read Rodriguez his statutory warnings and asked him for a blood specimen. Rodriguez refused to provide one. Officer Roberts asked the attending nurse whether he would be drawing Rodriguez's blood for medical purposes. The

nurse responded that he would. Roberts asked the nurse to use Betadine instead of alcohol to disinfect the site of the blood draw, which the nurse did.

Officer Roberts submitted his "DWI case report" to an HPD civilian evidence technician, who in turn contacted a paralegal in the Harris County District Attorney's Office to have a grand jury subpoena issued for Rodriguez's medical records and blood-test results. The day after the incident, the District Attorney's Office issued a grand jury subpoena to the hospital's custodian of records seeking Rodriguez's medical records. The hospital's records custodian responded by providing a copy of them. The records revealed that the blood-alcohol concentration in the sample drawn from Rodriguez at 4:21 A.M. was .209.

Officer Roberts included the blood-alcohol concentration data in his probable cause affidavit and contacted the District Attorney's Office intake division about filing a DWI charge against Rodriguez. The District Attorney's Office filed an information charging Rodriguez with DWI on December 16, 2010. No grand jury was in session when the subpoena issued and no grand jury deliberated whether to bring charges against Rodriguez.

The trial court made the findings of fact and conclusions of law supporting the denial of Rodriguez's motion to suppress, including:

- Office Roberts had reasonable articulable suspicion to detain Rodriguez and had probable cause to arrest him for DWI;

4

- Rodriguez's blood was drawn and tested solely for the purpose of medical treatment.

- The Fourth Amendment of the United States Constitution does not provide a reasonable expectation of privacy in blood-alcohol test results acquired through tests performed by hospital personnel on samples or specimens of blood drawn solely for medical purposes after a traffic accident.

- The same privacy concerns related to obtaining medical records in *Hardy*[1] apply in this case, where medical personnel drew Rodriguez's blood for the purpose of medical treatment following an accident in the course of a DWI investigation.

- Rodriguez did not have a reasonable expectation of privacy in the results of the blood-alcohol test administered on the sample of Rodriguez's blood that was drawn by hospital personnel for a legitimate medical purpose.

- Because Rodriguez did not have a reasonable expectation of privacy in his medical records obtained by grand jury subpoena process following an accident, Rodriguez lacks standing under federal or state law to contest the process by which the records were acquired.

## Discussion

### I. Standard of review

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *See Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The trial court is the sole trier of fact and judge of the weight and credibility of the evidence and testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Accordingly, we defer to the trial court's determination of historical facts if

---

[1] *State v. Hardy*, 963 S.W.2d 516 (Tex. Crim. App. 1997).

the record supports them. *Ford*, 158 S.W.3d at 493. We review de novo the trial court's application of the law to those facts. *Id.* "[T]he prevailing party is entitled to 'the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.'" *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011) (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). A trial court's ruling will be sustained if it is "reasonably supported by the record and correct on any theory of law applicable to the case." *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003) (citing *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002)).

## II.     Reasonable Expectation of Privacy

Rodriguez claims that the denial of his motion to suppress violates his privacy rights under the Fourth Amendment, the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the Texas Medical Practices Act. He also complains that the State failed to comply with the grand jury procedures set forth in Chapter 20 of the Texas Code of Criminal Procedure. These violations of state and federal law, Rodriguez contends, require suppression pursuant to article 38.23(a) of the Code of Criminal Procedure, which declares that "[n]o evidence obtained by an officer or other person in violation of [any state or federal law] shall be admitted in evidence against the accused." TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005).

6

The trial court concluded that Rodriguez lacked standing under any of the state or federal laws he invokes because he had no reasonable expectation of privacy in his blood-test results or medical records. Our primary consideration, therefore, is whether the trial court correctly concluded that none of those laws affords Rodriguez a reasonable expectation of privacy in his blood-test results, which were performed for medical purposes and obtained by the State for Rodriguez's prosecution.

**A. *State v. Hardy* and the Fourth Amendment**

The trial court relied on the Court of Criminal Appeals' decision in *State v. Hardy*, 963 S.W.2d 516 (Tex. Crim. App. 1997), to hold that Rodriguez lacked a reasonable expectation of privacy in protecting his blood-test results from disclosure to the District Attorney's Office. In *Hardy*, the Court of Criminal Appeals specifically held that the Fourth Amendment does not support a reasonable expectation of privacy protecting blood-test results from tests taken by hospital personnel solely for medical purposes after a traffic accident. *Id.* at 527.

The Fourth Amendment protects an individual from the government's search or seizure of a place or thing and from the government's physical intrusion into a place or thing if the individual has a reasonable expectation of privacy in the place searched or item seized. *See* U.S. CONST. amend. IV; *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 950–51 (2012); *Rakas v. Illinois*, 439 U.S. 128, 143, 99

7

S. Ct. 421, 430 (1978). A legitimate expectation of privacy exists when the individual seeking Fourth Amendment protection maintains a "subjective expectation of privacy" in the area searched "that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 31–33, 121 S. Ct. 2038, 2041–42 (2001).

A defendant has standing to challenge the admission of evidence obtained by an unreasonable search or seizure if he proves that he "had a legitimate expectation of privacy. . . ." *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013); *Rakas*, 439 U.S. at 143, 99 S. Ct. at 430; *Castleberry v. State*, 425 S.W.3d 332, 334 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The trial court found that Rodriguez had a subjective expectation of privacy in his medical records, but Rodriguez had the further burden to prove that society recognizes his subjective expectation as objectively reasonable. *See Betts*, 397 S.W.3d at 203. The trial court concluded that Rodriguez did not meet this further burden.

We agree with the trial court. Rodriguez contends that circumstances surrounding his blood draw differ materially from those in *Hardy.* Together with changes in the legal landscape since *Hardy*, these differences, he contends, support recognition of a privacy right in his blood-test results. He argues that "*Hardy* answered only the very narrow Fourth Amendment expectation of privacy in blood-test reports when blood is drawn for medical purposes following a traffic

accident," and not whether article 38.23 would require exclusion of evidence obtained in violation of state or federal law, or whether a reasonable expectation of privacy exists with respect to medical records generally. We examine both the factual and legal distinctions in turn.

Factually, Rodriguez distinguishes *Hardy* by pointing out that the blood test in that case took place after a traffic accident, whereas his did not. Our court did not find this to be a meaningful distinction in Fourth Amendment terms in *Owens v. State*, 417 S.W.3d 115 (Tex. App.—Houston [1st Dist.] 2013, no pet.). In that case, the defendant suffered an asthma attack shortly after his arrest. *Id.* at 116. The officer called an ambulance. *Id.* At the emergency room, the defendant presented with shortness of breath, and his blood pressure and heart rate were elevated. *Id.* Over the defendant's objection, the treating physician ordered a blood draw to rule out the possibility of other life-threatening conditions, such as a heart attack. *Id.* We held that the evidence supported a reasonable conclusion that the hospital staff acted out of medical necessity in drawing his blood and, as a result, article 38.23(a) did not bar the admission of his blood-test results that were eventually obtained via a grand jury subpoena. *Id.* at 118.

The undisputed evidence in this case demonstrates that hospital staff drew and tested Rodriguez's blood for medical purposes. Officer Roberts listed Rodriguez's fall in the parking lot, which caused his injury, as one of the facts

9

supporting his opinion that Rodriguez was intoxicated on September 25, 2010. Rodriguez does not identify any policy reason to support his proposed exception for the case in which a hospital patient was treated for injuries received in an accidental fall as opposed to injuries received in a traffic accident, and we have found none. *See Owens*, 417 S.W.3d at 116.

Legally, according to Rodriguez, *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S. Ct. 1281 (2001), recognizes a reasonable expectation of privacy for "those who undergo diagnostic tests in hospitals that—absent other considerations not present here (like a legal duty to disclose)—the results of their tests will not be shared with non-medical third parties." We do not read *Ferguson* so broadly. There, the public hospital performed diagnostic tests at the State's behest to obtain evidence of a patient's criminal conduct for law-enforcement purposes without first obtaining the patient's consent. *See id.* at 84–85, 121 S. Ct. at 1291–92. Here, the blood draw and blood-alcohol content test results were performed for medical treatment. This distinction renders *Ferguson* inapposite. *See Murray v. State*, 245 S.W.3d 37, 42 (Tex. App.—Austin 2007, pet. ref'd); *see also State v. Villarreal*, No. PD-0306-14, 2014 WL 6734178, at *15 (Tex. Crim. App. 2014) (explaining that drug-testing policy was invalidated in *Ferguson* because immediate objective of searches was to generate evidence for law enforcement purposes); *Garcia v. State*, 95 S.W.3d 522, 526–27 n.1 (Tex. App.—Houston [1st Dist.] 2002, no pet.)

(following *Hardy* post-*Ferguson* and applying *Hardy* to appellant's challenge under Texas Constitution). *Ferguson* does not support Rodriguez's contention that the Fourth Amendment protects his expectation of privacy in the medical records containing the blood-test results.

## B. Texas Medical Practices Act

The Texas Medical Practice Act (MPA) protects "record[s] of the identity, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician is confidential and privileged and may not be disclosed except as provided." TEX. OCC. CODE ANN. § 159.002(b) (West 2012). When the Court of Criminal Appeals adopted the Texas Rules of Evidence in 1985, it repealed the confidentiality provision of the MPA's precursor in Rule 509, which abrogates the physician-patient privilege in criminal cases. *See Hardy*, 963 S.W.2d at 519–23 (citing TEX. R. CRIM. EVID. 509 ("There is no physician-patient privilege in criminal proceedings.") (now TEX. R. EVID. 509(b))).

The Legislature later re-enacted the MPA without reference to Rule of Evidence 509. Rodriguez contends that the MPA's re-enactment means that, despite Rule 509, he retains a limited privilege and confidentiality in his medical records with respect to their discovery in criminal proceedings.

We disagree. The MPA excepts from its general rule of physician-patient confidentiality "any criminal prosecution where the patient is a victim, witness or

11

defendant" and for response to "a court or a party to an action under a court order or subpoena." TEX. OCC. CODE ANN. § 159.003(a)(10), (12) (West 2012). Rodriguez points to section 159.003(b) of the Occupations Code, which provides: "This section does not authorize the release of confidential information to investigate or substantiate criminal charges against a patient." *Id.* § 159.003(b). Like the rest of the chapter, this provision is directed at the physician's authority or lack thereof to disclose a patient's records; it does not limit the State's access to those records through subpoena. *See id.* § 159.003(a)(10), (12), *see also id.* § 159.004(1) (West 2012) (excepting to privilege of confidentiality in allowing for disclosure of medical records in situation other than court or administrative proceeding to "a governmental agency, if the disclosure is required or authorized by law"). Under the circumstances here, the MPA does not provide any basis for protecting Rodriguez's medical records or blood-test results from disclosure pursuant to subpoena and, as a result, it does not provide Rodriguez with grounds to assert a reasonable expectation of privacy.

**C. Grand jury statute**

Rodriguez further contends that the State procured his medical records in violation of the Texas grand jury statute because the assistant district attorney improperly delegated her authority to issue a subpoena. *See* TEX. CODE CRIM. PROC. ANN. arts. 20.02–20.05, 20.13 (West 2015). The attorney stipulated that she

routinely delegated the issuance of a subpoena to a member of her clerical staff, who, acting under the attorney's authority, signed the subpoena in the attorney's name with an ink stamp. Rodriguez also observes that the hospital provided the records directly to the investigating officer and that the grand jury was not in session when the district attorney's office issued the subpoena. But Rodriguez has not shown that he was personally aggrieved by any deviation from the regular grand jury subpoena procedure, and the hospital did not challenge the subpoena; it simply turned over the records.

During oral argument, Hernandez relied on *Boyle v. State*, which involved a challenge to the validity of law enforcement's use of a grand jury material witness attachment, to take Boyle, a truck driver, into custody. 820 S.W.2d 122 (Tex. Crim. App. 1989), *overruled on other grounds by Gordon v. State*, 801 S.W.2d 899 (Tex. Crim. App. 1990). The police officers investigating the homicide honed in on Boyle as a suspect, but admittedly "lacked sufficient probable cause to conduct an investigatory search or to procure the issuance of an arrest warrant" for him. *Id.* at 125, 129. The officers nonetheless acquired a grand jury material witness attachment, signed by a district judge, to arrest Boyle and take him into custody. *Id.* at 125–26. The officers read Boyle his *Miranda* warnings, interrogated him, and asked for consent to search his truck, which he gave. *Id.* at 126. An arrest

warrant charging Boyle with capital murder was issued a short time after the officers completed the investigatory search of the truck. *Id.*

Boyle moved to suppress the evidence procured during the interrogation and search, contending that the officers used his arrest pursuant to the material witness attachment to gain his permission to search the truck when they could not have done so by following procedures consistent with his rights under the federal and state constitutions. *Id.* at 127. The Court of Criminal Appeals examined the district attorney's affidavit supporting the attachment and concluded that it did not comply with the Code of Criminal Procedure's requirements for its issuance.[2] *Id.* at 129. The Court held that "the procedure utilized in placing the appellant under arrest . . . was a pretext, subterfuge, and deceptive artifice intentionally employed to circumvent the principles and tenets of the Fourth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. 9 of the Texas Constitution," making his arrest illegal. *Id.* at 129–30. But for the trucking company's independent consent to search the truck Boyle was driving, which the State first argued on rehearing, the admission of evidence seized during the truck's search would have amounted to harmful constitutional error. *Id.* at 136–37, 143.

---

[2] Defects in process included: the violation of a provision restricting issuance to county residents, which Boyle was not; the absence of a required sworn statement that the district attorney believed that the witness was about to move out of the county; an affidavit that set bond without statutory authorization; and no showing that the witness failed to obey a properly served subpoena before the attachment was issued. *Boyle v. State*, 820 S.W.2d 122, 128–29 (Tex. Crim. App. 1989).

14

The main distinction that renders *Boyle* inapposite is the admitted lack of probable cause when the attachment issued in *Boyle* and the admitted existence of probable cause when the subpoena issued in this case. Rodriguez has not suggested that the police could not have obtained the medical records other than by violating the grand jury subpoena process.

We consistently have held that, because a defendant does not have any constitutional or statutory reasonable expectation of privacy in blood-test results obtained for medical purposes while the defendant is under criminal investigation for DWI, he does not have standing to complain of any defects in the grand jury subpoena process. *Kirsch v. State*, 276 S.W.3d 579, 587 (Tex. App.—Houston [1st Dist.] 2008), *aff'd on other grounds*, 306 S.W.3d 738, 749 (Tex. Crim. App. 2010); *Garcia v. State*, 95 S.W.3d 522, 526–27 (Tex. App.—Houston [1st Dist.] 2002, no pet); *Dickerson v. State*, 965 S.W.2d 30, 31 (Tex. App.—Houston [1st Dist.] 1993), *pet. dism'd, improvidently granted*, 986 S.W.2d 618 (Tex. Crim. App. 1999); *accord Tapp v. State*, 108 S.W.3d 459, 461 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). We thus reject his challenge to the admissibility of the blood-test results based on any procedural irregularity in the grand jury process.

**D. HIPAA**

Finally, Rodriguez contends that his blood-test results should have been suppressed because the grand jury subpoena did not comply with the statutory

15

requirements for its issuance, and accordingly, the release in response to the subpoena violated HIPAA. In *Kirsch*, we agreed with other Texas courts of appeals that HIPAA does not protect from disclosure a patient's medical records and blood-test results obtained through lawful process and under circumstances that suggest the patient has committed the offense of DWI. 276 S.W.3d at 586–87 (citing *Kennemur v. State*, 280 S.W.3d 305, 312 (Tex. App.—Amarillo 2008, pet. ref'd), and *Murray v. State*, 245 S.W.3d 37, 42 (Tex. App.—Austin 2007, pet. ref'd)).

Rodriguez relies on the following HIPAA regulation:

(f)    Standard: Disclosures for law enforcement purposes. A covered entity may disclose protected health information for a law enforcement purpose to a law enforcement official if the conditions in paragraphs (f)(1) through (f)(6) of this section are met, as applicable.

    (1)    Permitted disclosures: Pursuant to process and as otherwise required by law. A covered entity may disclose protected health information:

        (i)    As required by law including laws that require the reporting of certain types of wounds or other physical injuries, except for laws subject to paragraph (b)(1)(ii) or (c)(1)(i) of this section; or

        (ii)    In compliance with and as limited by the relevant requirements of:

            (A)    A court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer;

            (B)    A grand jury subpoena; or

> > (C) An administrative request, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that:
> >
> > > (1) The information sought is relevant and material to a legitimate law enforcement inquiry;
> > >
> > > (2) The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and
> > >
> > > (3) De-identified information could not reasonably be used.

45 C.F.R. § 164.512(f). Specifically, Rodriguez claims that the subpoena failed to comply with the statutory requirements for its issuance and thus violates subsection (f)(ii)(B).

Any irregularity in the subpoena's issuance in this case does not support suppression of the blood-test results. When the Department of Health and Human Services (DHHS) promulgated the HIPAA regulations, it declared: "We shape the rule's provisions with respect to law enforcement according to the limited scope of our regulatory authority under HIPAA, which applies only to the covered entities and not to law enforcement officials." 65 Fed. Reg. 82462, 82679 (Dec. 28, 2000) (agency's response to public comments in connection with promulgation of final rule). HIPAA defines as "covered entities" health plans, health care clearinghouses, and health care providers who transmit health information

17

electronically. *See* 45 C.F.R. §§ 160.102(a), 164.104(a). An individual who believes his rights under HIPAA have been violated may file a complaint against a covered entity with DHHS's Office of Civil Rights. 45 C.F.R. § 160.306; *see* 42 U.S.C. §§ 1320d-5, 1320d-6 (providing for imposition of monetary fines on a covered entity in the event of a violation). But, as DHHS recognized, "under the HIPAA statutory authority, [DHHS] cannot impose sanctions on law enforcement officials or require suppression of evidence." 65 Fed. Reg. at 82679.

The State did not violate HIPAA because it is not a covered entity under HIPAA and accordingly, its conduct is not governed by HIPAA. *See United States v. Elliott*, 676 F. Supp. 2d 431, 440 (D. Md. 2009). Moreover, even if the State had violated HIPAA standards, we cannot read the exclusionary rule into a statute when its remedial provision is silent on suppression. *See, e.g.*, *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346, 126 S. Ct. 2669, 2679 (2006) (suppression is not proper remedy for violation of Article 36 of the Vienna Convention; reading rule requiring suppression into Convention would supplement terms and enlarge U.S. obligations, which would be "entirely inconsistent with the judicial function"); *Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S. Ct. 242, 247 (1979) (declaring that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it"). "HIPAA was passed to ensure an individual's right to

18

privacy over medical records; it was not intended to be a means for evading prosecution in criminal proceedings." *United States v. Zamora*, 408 F. Supp. 2d 295, 298 (S.D. Tex. 2006); *accord Elliott*, 676 F. Supp. 2d at 437–38 (denying motion to suppress on basis that government's interest in obtaining medical records with blood-test results and in addressing drunk-driving problem outweighed any privacy interest violated through use of improper subpoena).

We abide by *Kirsch* and hold that that HIPAA does not provide Rodriguez with a reasonable expectation of privacy in his medical records and blood-test results in connection with medical treatment for injuries sustained while in custody under suspicion of intoxication. *See* 276 S.W.3d at 587. As a result, the trial court did not err in denying Rodriguez's motion to suppress on this ground.

## III. Article 38.23 Standing

Article 38.23 provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX. CODE CRIM. PROC. ANN. art. 38.23. Its purpose is "to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement . . . [and] to deter unlawful actions which violate the rights of criminal suspects in the acquisition of

19

evidence for prosecution." *Wilson v. State*, 311 S.W.3d 452, 458–59 (Tex. Crim. App. 2010).

We have held that none of the laws that Rodriguez relies on supports his claim to a reasonable expectation of privacy in these circumstances, and he does not identify any other personal right that the State violated in obtaining the records. An accused does not have standing to complain about evidence that is illegally obtained unless it was done so in violation of his rights. *See Chavez v. State*, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000). Absent a substantive personal right, Rodriguez is not entitled to exclusion of the evidence under article 38.23.

**Conclusion**

We hold that the trial court did not err in denying Rodriguez's motion to suppress. We therefore affirm the judgment of the trial court.

Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Massengale.

Publish. TEX. R. APP. P. 47.2(b).

20

**Appendix B**

**Statement of Facts**

## Appendix B

### Statement of Facts

On September 25, 2010, Appellant was arrested for driving while intoxicated. There was probable cause for the arrest. FOF-6-11.[1] COL-1 There was no traffic accident. After Appellant arrived at "Central Intox," and while being escorted into the station, Appellant pulled away from the officer, lost his balance, and fell forward onto the parking lot, suffering injuries to his head and face that required medical attention. FOF-13-14. An ambulance was called and Appellant was transported to St. Joseph's Hospital. FOF-15. Houston Police Department Officer Roberts followed the ambulance to the hospital. Appellant remained in custody at the hospital. FOF-17-18. At the hospital, Roberts requested a specimen of Appellant's blood. Appellant refused. FOF-18.

Appellant's blood was drawn at the hospital by medical personnel (not as agents of law enforcement) for medical purposes. FOF-19,23, COL-2. Because Appellant was admitted for treatment, he was released from custody. FOF-24.

Based on a conversation with Roberts, an assistant district attorney agreed to accept charges on a "to be" basis following receipt of the blood alcohol test results

---

[1] References in this statement of facts to FOF are to the court's findings of fact and to COL are to the court's conclusions of law. This is the only document contained in the supplemental clerks' record.

1

from the hospital. Roberts completed a "to-be" police report and placed it in the designated place at HPD for later processing. FOF-25.

MacKenzie Gaston-Winne (Winne), a civilian evidence technician at HPD, received and processed the "to be" police report. In accordance with HPD policy, Winne emailed Rhonda Watson, a paralegal at the Harris County DA's office, and requested a grand jury subpoena for Appellant's medical records and blood test results. When Winne received the paperwork (variously referred to as a grand jury subpoena or alleged grand jury subpoena) dated September 28, 2010, from Watson, she attached an HPD cover sheet and transmitted it to the hospital. No peace officer was involved in this process. The documents obtained by Winne from Watson are contained in state's exhibit 2 and defense exhibit 1. FOF-26.

The hospital responded to the records request by transmitting Appellant's medical records to Watson on November 9, 2010. On November 10, 2010, Watson transmitted them to Winne. The records were never filed with either the District Clerk or any grand jury. FOF-50, COL-16.

A copy of the records were filed with the HPD accident division and the original were placed in the original "officer's packet" for his use. At no time were the records sent to the Grand Jury Division of the District Attorney's office, any Grand Jury, or to the District Clerk. FOF-27. Following receipt of the records,

2

Roberts prepared a probable cause affidavit that was presented to an assistant district attorney and charges were filed. FOF-51.

Catherine Evans was the Chief of the Vehicular Crimes Section of the DA's office. Watson worked under Evans. FOF-28. Watson had been issued a signature stamp by Evans with Evans' name on it for Watson's use when officers were seeking grand jury subpoenas. Watson was not an attorney or an assistant district attorney. FOF-29.

In a typical case, when a law enforcement officer wanted a grand jury subpoena and contacted Watson, she would verify that the records were being sought in connection with a pending investigation, would collect the necessary descriptive information, prepare a document labeled "grand jury subpoena," use the stamp provided by Evans to affix Evans' stamped signature to the document, and provide the document to the requesting officer. FOF-31. In a typical case, Watson was authorised to use the stamp to affix Evans' signature to a document labeled "grand jury subpoena" without obtaining express permission or consent from Evans or any other assistant district attorney. Watson could, if she chose to, consult with an assistant district attorney, but that decision was solely within her discretion. FOF-32.

Watson issued more documents labeled "grand jury subpoena" using Evans' stamp without obtaining express permission or consent from Evans or any assistant

district attorney than she did where she was given express permission on a specific case. FOF-9. Watson issued more documents labeled "grand jury subpoena" using Evans' stamp than Evans issued. FOF-34. More often than not, Evans was not aware when Watson used her signature stamp to issue a document labeled "grand jury subpoena." FOF-35. Watson issued the vast majority of documents labeled "grand jury subpoena" in misdemeanor DWI cases without the specific approval of Evans or any other assistant district attorney. FOF-37.

Watson was also given the discretion to choose which of the sitting grand juries she would designate as seeking the records sought by the document labeled "grand jury subpoena." FOF-38.

The District Attorneys's Office provided no written instructions to officers who obtained medical records with a grand jury subpoena or a document labeled "grand jury subpoena" as to what was to be done with the records once they were obtained. FOF-39. Such officers were not required to turn over the medical records they received to either the District Clerk or to the grand jury designated on the document. FOF-40. In typical cases, the records were kept at the law enforcement agency that obtained the records and in some cases copies were turned over to the district attorney's office, where they would be maintained in the case file for which they had been sought. FOF-41.

Officers who received records obtained with a grand jury subpoena or a document labeled "grand jury subpoena" received no instructions on maintaining privacy or secrecy of the medical records aside from the language contained within the grand jury subpoena or document labeled "grand jury subpoena" and the accompanying "HIPAA letter." FOF-42. The District Attorneys Office had no policy or procedure to protect and maintain the secrecy of the records obtained with a grand jury subpoena or a document labeled "grand jury subpoena" from other assistant district attorneys or other employees of the office not involved in the grand jury process. FOF-43.

Even though the District Attorney's Office was aware of the HPD standard procedure for handling documents obtained with a grand jury subpoena or a document labeled "grand jury subpoena" and placing them in files that may have been accessible to other police employees, the DA's office did not issue any instructions concerning grand jury secrecy. FOF-44.

It was the policy of the DA's office to exempt all law enforcement personnel from grand jury secrecy provisions. FOF-46. It was the policy and practice of the DA's Office not to require any witness served with a grand jury subpoena or a document labeled "grand jury subpoena" for medical records in misdemeanor DWI cases to appear before any grand jury or court so long as the witness produced the

5

requested medical records.  FOF-47.

Watson never dealt with any peace officer in relation to this case.  FOF-49. Upon receipt of the request from Winne, Watson placed Evans' stamped signature on the document labeled "grand jury subpoena" and caused it to be delivered to Winne.  Watson acted solely in her delegated capacity and never received express approval in this case from any assistant district attorney to issue the document labeled "grand jury subpoena."  FOF-49.

No person related to this case ever testified before a grand jury in relation to this case.  FOF-52.  There is no order from any court releasing the records obtained from the hospital from grand jury secrecy.  FOF-53.

Appellant had a subjective expectation of privacy in his medical records and the blood test results. FOF-54.  There is no other process (such as a subpoena, grand jury subpoena, summons, or attachment) related to obtaining records in this case other than the documents admitted into evidence.  FOF-55.  The term of the 185th grand jury was from August 3, 2010, through October 28, 2010.  FOF-56.

**Appendix C**

**Court's Findings of Fact and Conclusions of Law**

CAUSE NO. 1726063

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN COUNTY CRIMINAL COURT |
| | § | |
| V. | § | AT LAW NO. 5, OF |
| | § | |
| HECTOR LEAL RODRIGUEZ | § | HARRIS COUNTY, TEXAS |

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Defendant's Motion to Suppress Seized Blood Test Result Evidence was heard by the court on August 10, 2012, and August 20, 2012. Defendant, who is represented by J. Gary Trichter and W. Troy McKinney, was present on both occasions. The State was represented by Lewis Thomas of the Harris County District Attorney's Office.

**FILED**
Chris Daniel
District Clerk

NOV 11 2013

### Procedural History

Time: _____ Harris County, Texas

By _____ Deputy

1. On December 16, 2010, Defendant was charged with driving while intoxicated alleged to have occurred on September 25, 2010.

2. This case was scheduled for a pretrial hearing on Defendant's Motion to Suppress Seized Blood Test Result Evidence. The parties agreed in advance of the hearing that the court's ruling on the motion would be dispositive of the case: that is, if the motion were denied, Defendant would enter a plea consistent with the plea bargain agreed to by the

parties, reserving his right to appeal the denial of the motion to suppress. If the motion to suppress were granted, the State would dismiss the prosecution.

3      Reasonable suspicion for Defendant's initial detention and probable cause for his arrest were not in dispute. The parties and the court agreed that factual development of the facts leading up to Defendant's arrest were relevant for background purposes for context for the court.

The Court, having considered the evidence adduced at the hearing on the motion to suppress; and, having assessed the credibility of the witnesses who testified at that hearing, and reviewed the clerk's file, makes the following findings of fact and conclusions of law:

## I. Findings of Fact.

1.      The Court finds based on the clerk's record that appellant filed a Motion to Suppress (Blood)on July 22, 2011, and another Motion to Suppress Blood Test Result Evidence Because of Illegal Grand Jury Subpoena on July 28, 2011, claiming under the Fourth Amendment of the United States Constitution, and pursuant to Texas Code of Criminal Procedure Articles 38.23 that police unlawfully seized blood analysis result evidence, and requesting that the Court conduct a hearing to determine the admissibility of evidence obtained as a result of appellant's arrest. The court denied that motion on August 20, 2012.

2.      The Court finds based on observation of the hearing that Houston Police

2

Officer J.R. Roberts and Sergeant R. Pitts testified for the prosecution. The Court further finds from observation of their testimony that they were credible witnesses.

3. The Court finds that no witness testified for the defense.

4. The Court finds, based on observation of the hearing that the State offered into evidence the DIC 24, Medical Records of the Defendant, the probable cause statement for the arrest warrant, and a scene video of the arrest.

5. The Court finds, based on observation of the hearing that the Defense offered a packet of documents identified as a "TO BE" packet, stipulated statements of Catherine Evans and Mackenzie Gaston-Winne, portions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and certain sections of the Texas Code of Criminal Procedure.

6. The Court finds, based on observation of the hearing that the Defendant was stopped by Officer Roberts around 1:50 a.m. on September 25, 2010, as he operated a motor vehicle (a Porsche) the wrong way down Jackson Street, a public roadway in Harris County, Texas.

7. The Court finds, based on observation of the hearing that the Defendant had red, glassy eyes, slurred speech, and a strong odor of alcoholic beverage emitting from his breath.

8. The Court finds, based on observation of the hearing, that the Defendant stated to Roberts that he had been drinking the evening prior to the date of the stop.

3

9. The Court finds, based on observation of the hearing, that Officer Roberts performed the Horizontal Gaze Nystagmus on the Defendant in accordance with NHTSA guidelines and detected six out of six clues.

10. The Court finds, based on observation of the hearing that the Defendant refused to cooperate with further testing at the scene.

11. The Court finds, based on observation of the hearing, that at approximately 2:03 a.m., Officer Roberts arrested the Defendant for Driving While Intoxicated, handcuffed him and escorted the Defendant to a patrol vehicle operated by Sgt. Pitts.

12. The Court finds, based on observation of the hearing that Sgt. Pitts transported the Defendant to the HPD "Central Intox" Facility located at 61 Riesner Street in Houston, Harris County, Texas for the purpose of obtaining a sample of the Defendant breath for testing.

13. The Court finds, based on observation of the hearing that, upon arrival at the parking lot at Central Intox, Sgt. Pitts escorted the Defendant by holding the Defendant's arm, until the Defendant pulled away from Sgt. Pitts' grasp.

14. The Court finds, based on observation of the hearing that the Defendant lost his balance, falling forward onto the paved parking lot, suffering injuries to his head and face which required emergency medical attention.

15. The Court finds, based on observation of the hearing, that Sgt. Pitts called for an ambulance to treat the Defendant, and that Houston Fire Department personnel arrived

4

and then decided to transport the Defendant to St. Joseph's Hospital, a private facility in downtown Houston, Texas.

16. The Court finds, based on the observation of the hearing, that Officer Roberts followed the ambulance to St. Joseph's Hospital.

17. The Court finds, based on the observation of the hearing, that Officer Roberts, upon arrival at the hospital, informed the Defendant that he was still in custody.

18. The Court finds, based on the observation of the hearing, that Roberts read the DIC-24 statutory warning form to the Defendant at the hospital, requesting a specimen of the Defendant's blood for analysis, which the Defendant refused.

19. The Court finds, based on the observation of the hearing, that, while he was still at the hospital, Officer Roberts was approached by Nurse G. Gunn, and employee of St. Joseph's Hospital, who stated that the Defendant's blood would be drawn for treatment purposes, as part of the medical evaluation of his injuries.

20. The Court finds, based on the observation of the hearing, that Officer Roberts asked Nurse G. Gunn to use a Betadine (non-alcoholic) preparation when the Defendant's blood was drawn. Other than this, the Court finds that Officer Roberts exercised no other influence over the treatment or testing of the Defendant by St. Joseph's Hospital.

21. The Court finds, based on the observation of the hearing The Court finds that officer Roberts observed the blood being drawn by Nurse Gunn, after a Betadine preparation, at approximately 4:21 a.m. on September 25, 2010, in the St. Joseph's

5

emergency room, a sanitary place, as required by law.

22. The Court finds, based on the observation of the hearing, that Officer Roberts obtained the Defendant's Medical Record Number from Nurse Gunn at the hospital.

23. The Court finds, based on the observation of the hearing that the testing of the Defendant's blood was made solely for treatment purposes, as ordered by the treating physician at St. Joseph's Hospital.

24. The Court finds, based on observation of the hearing, that the Defendant was released from custody when the Officer learned that the Defendant would be admitted to the hospital for treatment.

25. The Court finds, based on observation of the hearing, that Officer Roberts spoke with an assistant district attorney who agreed to accept charges on a "to be" basis following receipt of the blood test result records from the hospital, and that Roberts created a "to be" police report, then placing it in the designated place at HPD for later processing by an evidence technician. Roberts played no other role in obtaining the blood test result records or Defendant's other medical records from the hospital.

26. The Court finds, based on observation of the hearing and the exhibits admitted, that MacKenzie Gaston-Winne (Gaston-Winne), a civilian employee at the Houston Police Department ("HPD") in the capacity of an evidence technician, received and processed the "to be" police report prepared by Roberts. As was the policy of HPD, Gaston-Winne emailed Rhonda Watson, a paralegal employed by the Harris County

6

District Attorney's Office in the Vehicular Crimes Division, requesting a grand jury subpoena to be used to obtain Defendant's medical records and blood test result records from the hospital. The Court further finds that, when she received the paperwork (referred to by the parties as a grand jury subpoena or an alleged grand jury subpoena) from Watson, Gaston-Winne attached an HPD cover sheet and transmitted it to the hospital. No peace officer was involved in the sending of the paperwork to the hospital. The documents obtained by Gaston-Winne from Watson are included within Defense Exhibit 1.

27. The Court finds, based on observation of the hearing and the exhibits admitted, that, once the medical records contained in Defense Exhibit 1 were received by HPD, a copy was filed with the HPD Accident Division and the original records were placed in the original "officer's packet" for his use, and that at no time were the records sent to the Grand Jury Division of the District Attorney's Office, any Grand Jury, or to the District Clerk.

28. The Court finds, based on observation of the hearing and the exhibits admitted, that Catherine Evans was Chief of the Vehicular Crimes Section of the Harris County District Attorney's Office at all times relevant to this case. Rhonda Watson worked in this section, under Evans, as a paralegal.

29. The Court finds, based on observation of the hearing and the exhibits admitted, that Rhonda Watson was issued a signature stamp with the name "Catherine

Evans" on it for use in her work. Specifically, Catherine Evans gave the signature stamp to Rhonda Watson for use in circumstances wherein officers were seeking a grand jury subpoena to obtain records in furtherance of a pending criminal investigation or cause. Rhonda Watson was not and is neither a licensed attorney nor an assistant district attorney.

30. The Court finds, based on observation of the hearing and the exhibits admitted, that, prior to working for Catherine Evans, Rhonda Watson previously worked for other chiefs of the Vehicular Crime Section, including Warren Diepraam and Brent Mayr, and Mrs. Watson had been previously trained on the issuance of documents labeled "grand jury subpoena" prior to Catherine Evans becoming chief of the Vehicular Crimes.

31. The Court finds, based on observation of the hearing and the exhibits admitted, that, in a typical case, a law enforcement officer who wanted a grand jury subpoena and who contacted the Vehicular Crimes section of the District Attorney's Office would deal with Rhonda Watson. Specifically, the law enforcement officer would discuss with Rhonda Watson why he or she was seeking a grand jury subpoena, and Rhonda would verify that the records were being obtained in furtherance of a pending criminal investigation or cause. If the subpoena was being sought in furtherance of a pending criminal investigation or cause, the officer would then provide the necessary descriptive information (such as the suspect's name, date of birth, and hospital where the

8

records would be located) to Rhonda Watson and Rhonda Watson would prepare a document labeled "grand jury subpoena," and, using the stamp provided by Catherine Evans, affix the stamped signature to the document, and then provide that document to the requesting law enforcement officer.

32. The Court finds, based on observation of the hearing and the exhibits admitted, that, in typical cases involving a law enforcement officer who wanted a grand jury subpoena and who contacted the Vehicular Crimes Section of the District Attorney's Office, Rhonda Watson was authorized to prepare and issue a document labeled "grand jury subpoena" without obtaining express permission or consent from Catherine Evans or any other assistant district attorney. Rhonda Watson could, if she chose to, consult with an assistant district attorney, but such decision was solely within her discretion.

33. The Court finds, based on observation of the hearing and the exhibits admitted, that, numerically speaking, Rhonda Watson issued more documents labeled "grand jury subpoena" using Catherine Evans' signature stamp without first seeking approval on cases than she did on cases where she was given express instructions to use it on a specific case.

34. The Court finds, based on observation of the hearing and the exhibits admitted, that, numerically speaking, Rhonda Watson prepared and executed more documents labeled "grand jury subpoena" using Catherine Evans signature stamp than Catherine Evans did.

9

35. The Court finds, based on observation of the hearing and the exhibits admitted, that, more often than not, Catherine Evans was not aware of the specifics on cases when Rhonda Watson used the Catherine Evans' signature stamp to issue a document labeled "grand jury subpoena."

36. The Court finds, based on observation of the hearing and the exhibits admitted, that, because of Rhonda Watson's previous training and experience, Catherine Evans did not require Rhonda Watson to check with her or any other assistant district attorney for guidance on the issuance of documents labeled "grand jury subpoena." It was assumed by Ms. Evans that, based on her training and experience, Watson would ask if she thought she needed guidance. On occasions when she had questions regarding the appropriateness of issuing a document labeled "grand jury subpoena," Rhonda Watson consulted with Catherine Evans or another assistant district attorney prior to issuance of a document labeled "grand jury subpoena."

37. The Court finds, based on observation of the hearing and the exhibits admitted, that it is unknown how many "grand jury subpoenas" for medical records in misdemeanor DWI cases were prepared and executed by Rhonda Watson using Catherine Evans' signature stamp, although this was a regular and routine practice. (However, Rhonda Watson issued the vast majority of document labeled "grand jury subpoena" and did so without specific case approval by Catherine Evans or any other Assistant District Attorney).

38. The Court finds, based on observation of the hearing and the exhibits admitted, that Rhonda Watson was given the discretion to make the decision in all grand jury subpoena cases as to which of the sitting grand juries she would designate as seeking the information contained in the document labeled "grand jury subpoena."

39. The Court finds, based on observation of the hearing and the exhibits admitted, that the District Attorney's Office had and provided no written instructions to officers who received grand jury subpoenas, or documents labeled "grand jury subpoena," to obtain medical records as to what was to be done with those records after they were obtained.

40. The Court finds, based on observation of the hearing and the exhibits admitted, that officers who received and executed grand jury subpoenas, or documents labeled "grand jury subpoena," were not required to turn over the documents they received to either the District Clerk or to the grand jury whose designation was included on the document.

41. The Court finds, based on observation of the hearing and the exhibits admitted, that, in typical misdemeanor DWI cases, medical records obtained with a grand jury subpoena, or a document labeled "grand jury subpoena," were kept at the law enforcement agency that had obtained the medical records. In some cases, copies of the medical records obtained were turned over to the District Attorney's Office: in the latter

type of instance, the records would be maintained in the District Attorney's case file for the case for which they had been sought.

42. The Court finds, based on observation of the hearing and the exhibits admitted, that officers who received grand jury subpoenas, or documents labeled "grand jury subpoena," received no instructions on maintaining privacy or secrecy of the medical records obtained aside from the language contained within the document labeled "grand jury subpoena" and the accompanying "HIPAA letter."

43. The Court finds, based on observation of the hearing and the exhibits admitted, that the District Attorney's Office had and has no policy or procedure to protect and maintain the secrecy of information obtained with a grand jury subpoena or a document labeled "grand jury subpoena," for medical records from other assistant district attorneys or district attorney employees who are not involved in the grand jury process.

44. The Court finds, based on observation of the hearing and the exhibits admitted, that, even though the District Attorney's Office was aware of the Houston Police Department's standard procedure of obtaining medical records through a grand jury subpoena or a document labeled "grand jury subpoena," and placing either the original documents received or a copy of the documents in police department files that may or may not have been accessible to other police employees, the District Attorney's Office did not issue instructions concerning grand jury secrecy.

45. The Court finds, based on observation of the hearing and the exhibits admitted, that the District Attorney's Office had no policy or procedure that would require protection of the privacy or secrecy of the content of those records aside from the regular handling of closed case or investigation files if it was determined that the records obtained with a grand jury subpoena or a document labeled "grand jury subpoena" did not support the filing of the criminal charge.

46. The Court finds, based on observation of the hearing and the exhibits admitted, that it was the policy of the Harris County District Attorney's Office to exempt all law enforcement personnel from grand jury secrecy provisions.

47. The Court finds, based on observation of the hearing and the exhibits admitted, that it was the policy and practice of the Harris County District Attorney's Office not to require a witness served with a grand jury subpoena or a document labeled "grand jury subpoena" for medical records in misdemeanor DWI cases to appear before any grand jury or court so long as the witness produced to the officer executing the document labeled "grand jury subpoena" the requested medical records.

48. The Court finds, based on observation of the hearing and the exhibits admitted, that it was not the policy or practice of the Harris County District Attorney's office to apply for or obtain a grand jury subpoena from the District Clerk.

49. The Court finds, based on observation of the hearing and the exhibits admitted, that, despite what was typically done with Watson dealing with a peace officer,

13

Watson never dealt with any peace officer in relation to this case. Upon receipt of the request from Gaston-Winne, Watson placed Evans' stamp on the grand jury subpoena contained in Defense Exhibit 1, and caused it to be sent and delivered to Gaston-Winne. Watson acted in her delegated capacity and never received express approval in this case from any assistant district attorney to issue the document labeled grand jury subpoena contained in Defense Exhibit 1.

50. The Court finds, based on observation of the hearing and the exhibits admitted, the hospital responded to the records request by transmitting the records in Defense exhibit 1 to Watson on November 9, 2010, who forwarded them to Gaston-Winne on November 10, 2010. The records were not filed by any entity or person with either the District Clerk or to a Grand Jury.

51. The Court finds, based on observation of the hearing and the exhibits admitted, that, following receipt of the blood test result and medical records, Roberts created a probable cause affidavit, which is contained in the court's records as the complaint and was admitted as State's Exhibit 3. It was presented to the on-duty assistant district attorney in the intake division and resulted in charges being filed.

52. The Court finds, based on observation of the hearing and the exhibits admitted, that no one, including Roberts, Gaston-Winne, or anyone from the hospital, ever testified before a grand jury in relation to this case. There is no evidence that

14

## II. Conclusions of Law

The Court draws the following conclusions of law:

1. Officer Roberts had reasonable articulable suspicion to detain the Defendant. Further, Officer Roberts had probable cause to arrest the Defendant for Driving While Intoxicated.

2. The Defendant's blood was drawn solely for legitimate medical purposes, and therefore did not require a warrant. Further, Nurse Gunn was not acting as an agent of law enforcement or of the State when he drew Defendant's blood.

3. The hospital released the medical records reflecting the results of the analysis of the Defendant's blood pursuant to the grand jury subpoena issued by Rhonda Watson.

4. Under the Fourth Amendment of the United States Constitution, there is no reasonable expectation of privacy in blood-alcohol test results acquired through tests performed by hospital personnel on samples or specimens of blood drawn solely for medical purposes after a traffic accident. *Hardy v. State*, 963 S.W.2d 516, 527 (Tex. Crim. App. 1997).

5. The same privacy concerns related to obtaining medical records in *Hardy* are applicable to this case, where the Defendant's blood was drawn by medical personnel for the purposes of medical treatment following an accident in the course of a DWI investigation.

16

6.    *Ferguson v. City of Charleston*, 532 U.S. 67 (2001) is distinguishable from this case because in this case, the blood was drawn by medical personnel for the purposes of medical treatment, not at the request of law enforcement.

7.    Health Insurance Portability and Accountability Act of 1996 (HIPAA) and regulations implementing that law were generally effective on April 14, 2003.  45 C.F.R. § 164.534.

8.    HIPAA provides for the disclosure of medical records to law enforcement pursuant to, among other exceptions, a grand jury subpoena, administrative request, or to alert law enforcement to the commission of a crime.  45 C.F.R. § 164.512(f)(1)-(6).

9.    Enactment of HIPAA did not overrule or preempt *Hardy*.  *Kirsch v. State*, 276 S.W.3d 579, 587 (Tex. App. – Houston [1st Dist.] 2008), *aff'd on other grounds*, 306 S.W.3d 738 (Tex. Crim. App. 2010); *Murray v. State*, 245 S.W.3d 37, 41-42 (Tex. App. – Austin 2007, pet. ref'd).

10.    Under Article 1, Section 9 of the Texas Constitution, there is no reasonable expectation of privacy in one's blood alcohol test results following a blood draw by hospital personnel for legitimate medical purposes.  *Tapp v. State*, 108 S.W.3d 459, 462 (Tex. App. – Houston [14th Dist.] 2003, pet. ref'd); *Garcia v. State*, 95 S.W.3d 522, 526-27 n.1 (Tex. App. – Houston [1st Dist.] 2002, no pet.), *Thurman v. State*, 861 S.W.2d 96, 100 (Tex. App. – Houston [1st Dist.] 1993, no pet.).

17

11. Defendant did not have a reasonable expectation of privacy in the BAC results of the blood alcohol test administered on the sample of Defendant's blood that was drawn by hospital personnel for a legitimate medical purpose in this case.

12. Defendant also did not have a reasonable expectation of privacy in his medical records which memorialized Defendant's BAC results, and which were obtained via the Grand Jury subpoena process.

13. Because Defendant did not have a reasonable expectation of privacy in his medical records obtained by Grand Jury subpoena following an accident, Defendant lacks standing under Federal or State law to contest the process by which the records were acquired in this case. *See Kirsch*, 276 S.W.3d at 587 (citing *Murray*, 245 S.W.3d at 42); *Tapp*, 108 S.W.3d at 461; *Garcia*, 95 S.W.3d at 526-27.

14. Therefore, Defendant lacks standing to contest the lack of compliance, if any, by the State with Chapters 20 and 24 of the Texas Code of Criminal Procedure, relating to the Grand Jury subpoena process.

18

15.   Based on the foregoing facts, and because Defendant lacks standing to contest the Grand Jury subpoena process, the Defendant's Motion to Suppress Seized Blood Test Result Evidence must be Denied.

Signed this 11th day of November, 2013.

_____
**JUDGE PRESIDING**
County Criminal Court at Law No. 5 of
Harris County, Texas

19

**Appendix D**

**Cases**

## Appendix D

## List of Cases Following or Relying on Dickerson

**Sullivan v. State**, No. 03-98-00151-CR, 1999 Tex. App. LEXIS 3150, 1999 WL 249412 (Tex. App–Austin, Apr. 29, 1999, pet ref'd)(relying on **Dickerson**; 38.23 only mentioned as a remedy for the alleged fourth amendment violation).

**Mazzucco v. State**, No. 09-98-513-CR, 1999 Tex. App. LEXIS 6466; 1999 WL 650864 (Tex. App--Beaumont, Aug 25, 1999, no pet.)(relying on **Dickerson** and **Comeaux**; article 38.23 not mentioned).

**Garcia v. State**, 95 S.W.3d 522, 526-27 (Tex. App.--Houston [1st Dist.] 2002, no pet.)(relying on **Dickerson**; article 38.23 not mentioned).

**Tapp v. State**, 108 S.W.3d 459, 462 (Tex. App.--Houston [14th Dist.] 2003, pet. ref'd) (relying on **Dickerson** and **Garcia** and without any discussion or additional authority, expressly extending them to reject an Article 38.23 claim).

**Harmon v. State**, No. 01-02-00035-CR, 2003 Tex. App. LEXIS 6172; 2003 WL 21665488 (Tex. App–Houston [1ˢᵗ Dist.], Jul. 17, 2003, no pet.)(relying on **Dickerson** and **Garcia**; article 38.23 not mentioned).

**Hicks v. State**, No. 01-02-00165-CR, 2003 Tex. App. LEXIS 9280; 2003 WL 22456045 (Tex. App.--Houston [1st Dist], Oct. 30, 2003, no pet)(relying on **Dickerson** and **Garcia**; article 38.23 not mentioned).

**Ramos v. State**, 124 S.W.3d 326, 339 (Tex. App.—Fort Worth 2003, pet. ref'd)(relying on **Dickerson**, **Garcia**, and **Tapp**, and claiming that this was also a holding of **Hardy**; article 38.23 not mentioned with respect to this issue).

**Murray v. State**, 245 S.W.3d 37, 42 (Tex. App.--Austin 2007, pet ref'd)(relied on **Ramos** and **Tapp** and without any additional analysis applied them to find no standing to raise an Article 38.23 claim).

**Kennemur v. State**, 280 S.W.3d at 312 (relying on **Ramos** and, without discussion or analysis, broadened to include no standing to raise a claim that HIPAA was violated; article 38.23 not mentioned).

**Mitchell v. State**, No. 05-06-01479-CR, 2008 Tex. App. LEXIS 6085; 2008 WL 3318883 (Tex. App--Dallas, Aug 12, 2008, no pet.)(relying on **Ramos**, generally, and **Murray** and **Tapp** in relation to no standing in relation to the HIPAA claim; 38.23 not mentioned).

**Kirsch v. State**, 276 S.W.3d 879 (Tex. App.–Houston [1st Dist.] 2008), **aff'd on other grounds**, 306 S.W.3d 738 (Tex. Crim. App. 2010)(relying on **Garcia**, **Tapp**, **Ramos** and **Murphy**; broadened to include no standing to raise a claim that HIPAA was violated; article 38.23 not mentioned).

**State v. Jewell**, No. 10-11-00166-CR, 2013 Tex. App. LEXIS 930, 2013 WL 387800 (Tex. App.--Waco, Jan. 31, 2013, no pet.)(relying on **Murray** and citing article 38.23 to affirm suppression of all medical records other than blood test results).